Filed 6/29/16  In re K.G. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.G., et al., Persons Coming Under the Juvenile Court Law. | B268302 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>L.G.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK80494) |

APPEAL from an order of the Superior Court of Los Angeles County.  Connie R. Quinones, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith David, Assistant County Counsel and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

L.G. (mother) appeals from the October 28, 2015 order terminating parental rights to her three children:  half-siblings K.G. (6 years old), S.G. (3 years old) and K.G.2 (18 months old).[1]  Mother contends insufficient evidence supports the juvenile court's finding that the Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) beneficial parent/child relationship exception to the legislative preference for adoption did not apply in this case.[2]  We affirm.

### INTRODUCTION

K.G., the oldest of the three children, was a newborn when domestic violence, general neglect and the mental and emotional problems of both parents brought the family to the attention of the Department of Children and Family Services (DCFS) in October 2009.  K.G. was detained in February 2010, returned to mother's custody in November 2010 and that dependency case was closed in May 2011.

The current case is the result of a 2012 "follow up referral."  When they were detained in January 2013, K.G. was three years old and S.G. was two; both children showed signs of physical abuse. They were declared dependent children in March 2013. The third child, K.G.2, was detained soon after he was born in May 2014.  In June 2014: (1) K.G.2 was declared a dependent child; (2) mother's reunification services as to K.G. and S.G. were terminated and a section 366.26 hearing (.26 hearing) was set as to them. In August 2014, the juvenile court ordered no reunification services as to K.G.2, based on mother's failure to reunify with K.G. and S.G.  (§ 361.5, subd. (b)(10).)  Mother's section 388 petition seeking an additional six months of reunification services was denied in August 2015.  Mother did not challenge the orders terminating her reunification

---

[1]    The children had different fathers who participated in the dependency proceedings to differing extents.  None is a party to this appeal.

[2]    All future undesignated statutory references are to the Welfare and Institutions Code.  Section 366.26 was amended effective January 1, 2016.  All references to section 366.26 are to the statute as it was on October 28, 2015, the date of the challenged order.  All references to the "beneficial parent/child relationship exception" are to the exception described in section 366.26, subdivision (c)(1)(B)(i).

services as to K.G. and S.G., denying reunification services as to K.G.2, and denying her section 388 petition. Accordingly, the following statement of facts focuses only on those facts relevant to the issue on appeal – sufficiency of the evidence to support the juvenile court's finding that the beneficial parent/child relationship exception does not apply in this case.

FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules of appeal from an order terminating parental rights (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228), the evidence established that mother suffers from "Bi-Polar Disorder Type II, paranoid type," Intermittent Explosive Disorder, Severe Major Depression, Conduct Disorder and "mild mental retardation." She has been prescribed medication to treat one or more of these conditions and was a client of the Harbor Regional Center (HRC). In December 2012, mother's regional center counselor described mother as "rude, belligerent, threatens and frightens the services providers . . . ." The counselor expressed concern for the children because mother "is explosive and violent." When the children were located and detained several months later, the social worker observed signs of physical abuse. In March 2013, mother pled no contest to a section 300 petition that based dependency jurisdiction on physical abuse and mother's mental and emotional problems. Mother was given twice weekly monitored visits of two hours per visit.

Although mother visited consistently, the visits did not always go well. In September 2013, DCFS reported that mother had become "increasingly verbally aggressive during the visits. [The foster mother], reports that the children will hit, bite, and fight with other children at the McDonalds. . . . [S]ometimes the other children will hit or push [K.G.] after he hits them first. . . . [M]other will begin yelling, 'Who did this? I'm going to fuck them up.' [Foster mother] worries that the mother will get into a physical fight with other parents at the McDonalds. . . . [M]other is constantly using the 'F' word in front of the children at their visits. . . . [T]he children have become more aggressive. [¶] . . . [T]he children do not listen to their mother and [K.G.] has slapped his mother twice during the visits. . . . [The foster mother] worried what mother would

3

have done if she had not been present. . . . Mother gets upset that the children do not listen to her and she appears to become frustrated during the visits. [The foster mother] told the mother that she needs to be firm in setting boundaries and not give in to them. . . . [Mother responded] that she only gets to see them twice a week so she doesn't have to tell them no, and she will work on her parenting skills after her children are returned to her."

In December 2013, K.G. and S.G. were placed in a new foster home and the new foster parents' adult daughter, Norma, monitored some visits at McDonalds. K.G. continued to have aggression issues; he hit both mother and Norma. Norma reported that the children "act out" until mother gives them what they want. On one occasion, K.G. pushed a chair, threw his plate of food and sat on the floor having a tantrum when mother did not order the food he wanted. Mother told K.G. "not to act that way," but then got him the food he wanted. On another occasion, a birthday celebration for S.G. at Chuck E. Cheese, K.G. pushed his own and S.G.'s face into the birthday cake. Norma put the children into a "time out," but mother's solution was to give them game tokens. Mother said she did not want to discipline the children because they do not live with her. A social worker who observed a monitored visit noted that the children responded to Norma when she told them to stop negative behavior, but ignored mother.

Mother's therapist also observed a monitored visit. She described mother as "attentive, communicative, and caring towards both children." In a letter to DCFS, the therapist said mother "tends to over-verbalize with her children, giving long explanations regarding their actions and behaviors. This appears to be beyond their current level of understanding . . . . The result is that the children appear not to listen to her past a certain point, which frustrates [mother]. The children did respond to her shorter requests and directives regarding their behavior, as when she asked them to stop yelling, to play nicely with each other and to give turns to the other children in the play area." But it was later revealed that mother gave K.G. a toy before the visit and promised more if he behaved during any observed visit.

4

After mother tested positive for marijuana at K.G.2's birth in May 2014 (K.G.2 tested negative), K.G.2 was detained and placed in the same foster home with his half-siblings. Adjudication of the section 300 petition filed as to K.G.2 and a permanency plan for K.G. and S.G. were the subjects of a June 2014 hearing. According to the report for that hearing, mother's visits with the children were consistent, but she was often late. The social worker who observed one monitored visit reported that mother held K.G.2 for about 30 seconds, then put him in the carrier and spent the remainder of the visit with K.G. and S.G., who seemed "very happy" to see mother. As to K.G.2, the juvenile court sustained the section 300 petition and set the matter for an August 2014 disposition hearing. As to K.G. and S.G., the juvenile court terminated mother's reunification services and set the matter for a .26 hearing in October 2014. At the August 2014 disposition hearing as to K.G.2, the juvenile court ordered no reunification services based on mother's failure to reunify with K.G. and S.G. (§ 361.5, subd. (b)(10)); the court identified adoption as the permanent placement plan for K.G.2 and set a .26 hearing for December 2014.

In September 2014, the therapist who was working with both K.G. and S.G. reported to the Child Abuse Hotline that, during a therapy session, K.G. accused Norma of slapping him. A physical examination showed no signs of physical abuse. K.G. later recanted the accusation, telling the social worker that he was mad at Norma for not taking him to Chuck E. Cheese.[3]

In October 2014, mother's counsel reported that mother was enrolled in a residential treatment program which would allow mother to leave for monitored visits. The juvenile court set the matter for a .26 hearing in December 2014.

By December 2014, a prospective adoptive family for all three children had been identified. Meanwhile, the children were still together in the same foster home. S.G. and

---

[3]     Before the child abuse investigation triggered by the therapist, the foster parents had expressed interest in adoption. By the time of the next hearing, they had reconsidered. Norma was willing to become the children's legal guardian if no adoptive home could be identified.

K.G.2 were doing well, but five-year-old K.G. was struggling. At school, K.G. had become verbally and physically aggressive with other children. His behavior issues began when visits were curtailed by mother's incarceration. Visits resumed after mother was released into a 30-day in-patient substance abuse program, but K.G.'s behavior issues did not abate. K.G. became upset that other children were able to live with their mothers at the facility, but he was not. K.G. accused the foster parents of hating him and hitting him.

Norma monitored a visit at a Chuck E. Cheese on December 6, at which mother was accompanied by Natasha, a volunteer from mother's in-patient substance abuse provider (the program required in-patients to be accompanied when they leave the facility). Natasha went with mother into a nearby store where she observed mother allow K.G. to steal a Spiderman scarf and glove set; when Natasha confronted mother, mother responded that she did not see anything wrong in allowing her child to steal; Natasha told Norma about the incident and Norma reported it to the social worker.

At the December 2014 hearing, the juvenile court identified adoption as the permanent placement plan for all three children and continued the .26 hearing to February 2015.

By that hearing, the children's visits (including overnight) with the prospective adoptive parents were going well. DCFS anticipated no difficulty in placing the children with the family once parental rights were terminated. The children's counsel asked for a continuance to give the children more time to get to know the prospective adoptive family before parental rights were terminated. Mother's counsel stated his intention to contest termination based on the parent-child bond. The .26 hearing was continued to June.

All three children were placed in the prospective adoptive home in February 2015. In March, DCFS filed a section 388 petition seeking to change the visitation order from two monitored visits per week to one monitored visit per month. DCFS argued the change would be in the children's best interests because "[mother's] visits hamper the emotional development of the children as well as their emotional transition into adoption

6

as she questions their loyalty to her, and the children become compelled to choose between [mother] and their prospective adoptive parents."

The report for the hearing on DCFS's 388 petition described incidents of mother's inappropriate behavior during telephone calls and monitored visits –while the children were placed with the foster parents and after they were placed with the prospective adoptive family. At one visit, mother accused the prospective adoptive parents of physically abusing K.G. after mother saw a small cut on K.G.'s finger. Mother became so irate the social worker had to call for police assistance. During this time (1) mother threatened K.G. that she would not attend future visits unless he behaved properly; (2) K.G. accused mother of twisting his arm; and (3) mother generated a child abuse referral against the prospective adoptive mother by telling the social worker that K.G. told her the prospective adoptive mother was hitting him. DCFS found the allegations were unfounded. Based on DCFS's conclusion that mother was interfering with the children's ability to bond with the prospective adoptive parents, it argued it would be in the children's best interest to limit their contact with mother to one monitored visit and one monitored telephone call each month. The juvenile court reduced mother's visits from twice to once per week.

Mother enrolled in a residential recovery program on June 15, 2015. On June 30, 2015, mother filed a section 388 petition seeking an additional six months of reunification services and an order that the children be placed closer to her residence. As changed circumstances, mother alleged she had entered a residential treatment program, now accepted responsibility for the events that led to dependency jurisdiction and was "engaged in a new way of life." Mother alleged the change would be in the children's best interests because they were bonded to mother, mother had maintained contact with them throughout dependency proceedings and they would benefit from growing up with a "birth mother who has come to understand the preciousness of her identity as a mother." The juvenile court granted a hearing on mother's petition, set it for August 2015 and continued the .26 hearing to the same date.

For that hearing, DCFS reported that the children were doing well with the prospective adoptive family. K.G. and S.G. were in therapy to address their aggressive behavior, adoption and abandonment issues. The social worker was unable to confirm mother's progress in the residential treatment program. The social worker monitoring visits reported that the children "do not appear to be bonded to [mother] as they don't get excited to see her and are indifferent whether they have a visit or not. [The social worker] stated the children view visits with [mother] more as playtime than as time to spend with their mother. [The social worker] stated she could see a stronger bond between the children and their current caregiver as they get excited to see her after visits."

Mother was 26 years old by the time of the August 2015 hearing. She testified that she started smoking marijuana when she was 12 years old; she had once tried methamphetamine. She understood the children were detained for "alleged child abuse and domestic violence and substance abuse." Mother still hoped to reunify with them. She had completed the court-ordered programs, was taking prescribed medication to treat her bi-polar disorder and had been sober since December 30, 2014. She lived in a recovery home for addicts and participated in a 12-step program. With the help of her substance abuse program, mother had applied for low-income housing for herself and the children and planned to get her G.E.D. Mother used to be "hot-headed" but through therapy had learned to "be quiet and listen and understand before" speaking. In parenting classes, mother learned to be more patient. She believed her weekly monitored visits went well. After learning that S.G. may have some learning problems, mother bought her a puzzle to help her learn the alphabet. During one monitored visit, mother called the police to report that K.G. was being physically abused after K.G. told mother the caregiver had hit him. Mother wanted the court to change the children's placement. It did not bother mother that the children referred to the caretaker as "mom" because she understood that the caretaker was acting as the children's mother. Finding the requested change would not be in the children's best interests, the juvenile court denied mother's section 388 petition. It continued the .26 hearing to October 2015.

8

At the .26 hearing on October 28, 2015, mother opposed termination of her parental rights based on the beneficial parent/child relationship exception.[4] Mother introduced into evidence seven photographs of her with the children; photos which mother argued proved their bond. The only witness at the hearing, mother testified that throughout these dependency proceedings she had been limited to monitored visits. In the most recent visits at the DCFS office in Pomona, mother played an A-B-C puzzle game with the children and allowed them to play with her phone; the children liked to be held by mother. During visits, mother talked to K.G. about school and K.G. told mother he was doing well. However, mother did not know what grade he was in or the name of his school. Mother had been told that S.G. has a learning disability, but mother did not know this for herself. In the prior few months, mother estimated that five of her monitored visits had been cancelled by someone other than mother; mother had to cancel one visit because of a doctor's appointment. To compensate for missed visits, her weekly visits were extended by half an hour. Mother argued application of the exception based on her regular visits, attendance at birthday parties and that the children had asked when they can live with her again. The photographs showed that the children "are happy and joyous in her presence." She maintained that the fact that she had no unmonitored visits should not be determinative because she had not been "given a chance to proceed to unmonitored visitation."

DCFS countered that frequent visits and a loving relationship were insufficient to trigger the beneficial parent/child relationship exception. Counsel for the children agreed with DCFS: "At this point in time, the fact that [mother] loves her children and even in the picture that she is with them and they look like they're smiling – it does not establish a bond that outweigh[s] their need of permanency, which they have with the caretakers who are willing to adopt them. [¶] So as hard as it as this day [sic], I would ask that the parents' rights for all the children will be terminated."

---

**4** The juvenile court denied mother's request to continue the matter for a contested .26 hearing; mother's request was opposed by DCFS and the children. Mother does not pursue this point on appeal.

The juvenile court concluded that mother did not meet her burden of showing the exception applied. It noted that five-year-old K.G. and four-year-old S.G. had been in placement for more than two years; one-year-old K.G.2 had been in placement virtually all his life. Mother did not have a parental role in the children's lives "other than being the fun visitor for once a week in a monitored" setting. The juvenile court found the benefit of preserving that relationship did not outweigh the benefit of stability that would flow from adoption, and terminated parental rights. Mother timely appealed.

**DISCUSSION**

Mother's sole contention is that the juvenile court erred in terminating her parental rights and freeing the children for adoption. She argues there was not sufficient evidence to support the juvenile court's finding that the beneficial parent/child relationship exception to the legislative preference for adoption did not apply. Specifically, mother argues applicability of the exception was established by the evidence that she maintained regular visitation, the children were "happy and joyous in her presence," and "she was not given the opportunity for unmonitored visits." We disagree.

A.     *Standard of Review*

There is a split of authority concerning the standard of review. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 and *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [hybrid combination of substantial evidence and abuse of discretion standards; applying substantial evidence test to determination of existence of a beneficial sibling relationship and the abuse of discretion test to issue of whether that relationship constitutes a compelling reason for determining termination would be detrimental to the child]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [applying substantial evidence test]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion test].) Under either standard, we would affirm the juvenile court's order in this case.

B.     *Applicable Legal Principals*

Until reunification services are terminated and "the section 366.26 hearing is set, the parents' interest in reunification is given precedence over a child's need for stability and permanency. [Citation.]" (*In re Julia U.* (1998) 64 Cal.App.4th 532, 543.) But

10

reunification is no longer the goal at the .26 hearing. "The selection and implementation hearing proceeds upon the premise that efforts to reunify are over, and the objective is to select the long-term plan for care and custody which will most benefit the child. [Citations.]" (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1090.)

Section 366.26, subdivision (c)(1) reflects the legislative preference for a permanent plan of adoption by directing the juvenile court, if it determines by clear and convincing evidence that the child is likely to be adopted, to "terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) One exception to the preference of adoption is a finding that termination would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Interaction between parent and child will usually confer some benefit on the child, but that is not enough. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' [Citations.]" (*In re K.P., supra,* 203 Cal.App.4th at p. 621.) Further, the emotional attachment between the parent and child must truly reflect a parent-child relationship and not just a friendly visitor or friendly non-parent relationship, such as an aunt. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) The requisite showing of a parent-child relationship rather than a friendly visitor relationship is difficult to make in situations where the parents have essentially never had custody of the child and contacts have not advanced beyond supervised visitation. (*In re Casey D., supra*, 70 Cal.App.4th at p. 51.)

The juvenile court must balance the "strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child

11

would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, at p. 575.)

C.     *Analysis*

Mother has failed to meet her burden of showing the beneficial parent/child exception applies in this case. First, although mother clearly loves the children, she has failed to show that her relationship with the children was that of parent and child, not just a friendly adult visitor. At the time of the .26 hearing in October 2015, 18-month-old K.G.2 had been removed from parental custody virtually his entire life; 6-year-old K.G. and 5-year-old S.G. had been removed for almost three years (plus one year K.G. was removed in the prior dependency case). During that time, mother had only monitored visits with the children; she never petitioned for unmonitored visits. Mother made a conscious decision not to discipline the children – an important part of parenting. Perhaps more importantly, the evidence shows that mother did not recognize behavior that required discipline. For example, mother saw nothing wrong with K.G. stealing while in her presence during a December 2014 monitored visit. Mother did not appear to grasp K.G.'s behavior issues.

Second, she has not shown that the benefit of maintaining a relationship with mother outweighs the benefits of adoption. Other than mother's assertion, there was no evidence on the subject. On this record, we conclude the juvenile court's finding that the beneficial parent/child relationship exception did not apply was supported by substantial evidence.

## DISPOSITION

The order terminating parental rights is affirmed.

RUBIN, ACTING P. J.

WE CONCUR:

FLIER, J.                                        GRIMES, J.

12